Joanna E. Menillo, Esq. (NJ Bar No. 154842015)
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
joannamenillo@quinnemanuel.com

John O'Sullivan (*pro hac vice* to be submitted)
2601 South Bayshore Drive, Suite 1500
Miami, FL 33133
(305) 402-4880
johnosullivan@quinnemanuel.com

Marie Hayrapetian (*pro hac vice* to be submitted)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
mariehayrapetian@quinnemanuel.com

*Attorneys for Petitioner Megan Pete*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Motion to Compel Livingston Allen to Comply with Rule 45 Subpoena | **Case No.**<br><br>*Related to Civil Action No.*<br>*1:24-cv-24228-CMA (S.D. Fla.)* |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL LIVINGSTON ALLEN TO COMPLY WITH MEGAN PETE'S SUBPOENA

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..........................................................................1

FACTUAL BACKGROUND .............................................................................3

LEGAL STANDARD .........................................................................................7

I.    ALLEN SHOULD BE COMPELLED TO SIT FOR
      REDEPOSITION BECAUSE HE CANNOT AVAIL HIMSELF OF
      PROTECTION UNDER NEW JERSEY'S SHIELD LAW .........................8

      A.    Allen Does Not Bear The Requisite Connection to News
            Media..............................................................................................10

      B.    Allen Cannot Demonstrate The Necessary Purpose To Gather
            Or Disseminate News. ....................................................................12

      C.    Allen Did Not Obtain The Underlying Material In the Course of
            Professional Newsgathering Activities...........................................12

II.   ALLEN SHOULD BE COMPELLED TO PRODUCE
      DOCUMENTS RESPONSIVE TO MS. PETE'S SUBPOENA .................14

CONCLUSION ................................................................................................14

## <u>TABLE OF AUTHORITIES</u>

**Page**

### <u>Cases</u>

*Broadbent v. Moore-McCormack Lines*,
    5 F.R.D. 220 (E.D. Pa. 1946) ...............................................................................8

*GMAC Bank v. HTFC Corp.*,
    248 F.R.D. 182 (E.D.Pa. 2008) ......................................................................2, 7

*In re Jan. 11, 2013 Subpoena by Grand Jury of Union Cnty.*,
    75 A.3d 1260 (N.J. Super. Ct. 2013) .............................................................9, 13

*LifeScan, Inc. Smith Roche Diagnostics Corp. v. Smith*,
    2023 WL 7086754 (D.N.J. Apr. 14, 2023) ....................................................2, 7

*In re Napp Technologies, Inc. Litigation*,
    768 A.2d 274 (N.J. Super. Ct. 2000) ................................................................12

*Parker v. Atl. City Bd. of Educ.*,
    2017 WL 11466008 (D.N.J. Mar. 7, 2017)........................................................8

*Rucker v. Hunterdon Med. Ctr.*,
    2024 WL 4827331 (D.N.J. Nov. 19, 2024) ......................................................14

*Senna v. Florimont*,
    958 A.2d 427 (N.J. 2008)....................................................................................9

*Sperber v. Elwell*,
    2014 WL 12621964 (D.N.J. June 26, 2014) ......................................................7

*State Farm Mut. Auto. Ins. Co. v. New Horizon, Inc.*,
    250 F.R.D. 203 (E.D. Pa. 2008) ........................................................................7

*Too Much Media, LLC v. Hale*,
    20 A.3d 364 (N.J. 2011)...............................................................................10, 13

*Too Much Media, LLC v. Hale*,
    993 A.2d 845 (N.J. Super. App. Div. 2010),
    *aff'd and modified*, 20 A.3d 364 (N.J. 2011).........................................9, 11, 12

## **Statutes**

N.J.S.A. § 2A:84A-21................................................................................9

N.J.S.A. § 2A:84A-21a........................................................................12, 13

## **Rules/Other Authorities**

Fed. R. Civ. P. 30..................................................................................7

Fed. R. Civ. P. 37.............................................................................5, 7, 8

Fed. R. Civ. P. 45.................................................................................14

N.J.R.E. 508.........................................................................................9

## **Internet Authorities**

"Akademiks," INSTAGRAM.COM,
   https://www.instagram.com/akademiks/...........................................11

"King Akademiks," YOUTUBE.COM,
   https://www.youtube.com/results?search_query=dj+akademiks; ....................11

## PRELIMINARY STATEMENT

This motion arises from Livingston Allen's deliberate obstruction of discovery in a defamation and harassment lawsuit pending in the Southern District of Florida against Milagro Cooper (the "Florida Action"). Cooper, an internet personality, has waged a years-long campaign to smear and intimidate Petitioner Megan Pete, professionally known as Megan Thee Stallion, in coordination with Ms. Pete's convicted assailant, Daystar Peterson (a/k/a "Tory Lanez"). Allen—better known as "DJ Akademiks"—was subpoenaed to testify about his role in amplifying Cooper's defamatory statements. At his deposition, Allen flatly refused to answer the most critical question: who provided him with DNA evidence that he and Cooper simultaneously announced on social media at a time when it was under a protective order and available only to prosecutors, Peterson, and his counsel. Cooper herself confirmed that she and Allen had the same source of that information but was unable to recall where it came from. And Allen confirmed he received the information through an "exclusive," but refused to name the source. Identifying this source is essential to proving the coordination between Cooper and Peterson and exposing Cooper's intent for perpetuating false and demeaning claims against Ms. Pete.

Rather than answer, Allen insisted "that's something that [he] would never reveal" and attempted to hide behind a claim of journalistic privilege. But under questioning, he admitted that he is not a journalist—he has publicly disclaimed the

1

title, invokes it only when convenient, and describes himself instead as an online "streamer" and "entertainer." When that pretense collapsed, Allen abruptly shifted course, claiming he could no longer "recall" the very source he had moments earlier vowed never to reveal. His testimony was evasive, contradictory, and obstructive.

Allen has also failed to produce a single responsive document, including correspondence showing how he obtained DNA evidence before it was released. Without Allen's testimony and documents, Ms. Pete will be denied access to critical evidence of Cooper's defamatory intent and coordination with Peterson. The Court should, therefore, enter an Order compelling Allen to produce documents responsive to Ms. Pete's subpoena and sit for another deposition where he must answer the questions he improperly refused.[1]

---

[1]  Ms. Pete respectfully requests that any redeposition be supervised by this Court and occur in person to ensure Allen respects the process. During his deposition, Allen provided non-responsive and evasive answers clearly designed to create "content" for his many followers, as he professed he would do prior to his deposition. (*See e.g.*, Menillo Decl. Ex. C at 34:15–39:14; 137:22–139:18; 141:5–142:22; 275:22–279:13; *id.* Ex. D, https://x.com/Real1of1TV/status/1951770496435122364 at 0:45–0:59 (claiming he would "put [his] own deposition out" because it was "content" for him).) And when asked whether he was recording his deposition, other than identifying two "surveillance" cameras behind him, he answered in the negative. (*Id.* Ex. C at 22:5–24:17.) Nevertheless, he secretly screen-recorded the proceedings and made good on his promise to post it online thereafter. (*Id.* Ex. E, https://www.instagram.com/reel/DNs4aQnWoFQ/?utm_source=ig_web_copy_link &igsh=MzRlODBiNWFlZA%3D%3D.) *GMAC Bank v. HTFC Corp.*, 248 F.R.D. 182, 193 (E.D.Pa. 2008) (directing redeposition under court supervision where deponent "failed to answer questions propounded at his deposition" and provided "evasive and non-responsive" answers); *LifeScan, Inc. Smith Roche Diagnostics*

## FACTUAL BACKGROUND

Ms. Pete is a Grammy Award–winning musician who became the target of a relentless campaign of online abuse after cooperating with authorities in the prosecution of her shooter, Peterson.  Peterson was convicted of shooting Ms. Pete in July 2020 and is currently serving a ten-year prison sentence in California. (Menillo Decl. Ex. A ¶ 1.)   Cooper attended Peterson's trial, where the jury unanimously found him guilty, yet she repeatedly used her social media platform to accuse Ms. Pete of perjury, alcoholism, and requiring a guardian, while spreading false theories about the shooting and the evidence.  (*Id.* ¶¶ 1–7.)

This was not random commentary or fair criticism.  Cooper leveraged her platform to defame, harass, and demean Ms. Pete before, during, and after Peterson's criminal trial in a fashion that no person, let alone a victim of a violent crime, should be forced to endure.  And it was calculated:  Cooper engaged in a coordinated effort undertaken in lockstep with the perpetrator of the violent crime against her and his surrogates, to attempt to silence her, undermine the jury's verdict, and destroy Ms. Pete's reputation in the court of public opinion.  On October 29, 2024, Ms. Pete sought to hold Cooper accountable for this conduct by filing the Florida Action for

---

*Corp. v. Smith*, 2023 WL 7086754, *5 (D.N.J. Apr. 14, 2023) (granting redeposition for evasive and obstructionist behavior).

defamation, promotion of an altered sexual depiction, intentional infliction of emotional distress, and cyberstalking.

Discovery in that litigation has confirmed what Ms. Pete knew to be true from the start: Peterson and his father enlisted and paid Cooper to amplify these defamatory messages, providing her money, misinformation, and access. And they encouraged her to act as their public mouthpiece to circumvent a protective order against Peterson and court-ordered gag restrictions in the criminal case. (*Id.* ¶ 1.) What's more, in the moments before the Florida Action was filed and while it was pending, Cooper engaged in an elaborate cover-up by deleting thousands of messages from her phone which are now the subject of a spoliation motion before the Southern District of Florida. *Pete v. Cooper*, 24-cv-24228 Dkt. Nos. 90, 93, 107 (S.D. Fla. 2024). Peterson, too, did his part by being so obstructive in his deposition that he has been ordered to sit for a court-supervised deposition. *Id.*, Dkt. No. 104.

***Allen's Knowledge of Cooper's Scheme:*** Cooper and Peterson, however, are not the only witnesses with knowledge of their scheme. On February 23, 2022, Cooper stated in a livestream that she and Allen had "the same sources" for misinformation she spread about the evidence in Peterson's case. (Menillo Decl. Ex. A ¶ 34; Ex. C at 309:14–16; 311:2–312:11.)

Allen considers himself to be "a streamer" and "media personality" among other things, who self-purportedly streams about "[m]usic, urban topics, hip-hop

4

specifically, music industry stuff." (*Id.* Ex. C at 43:7–45:19.)  Like Cooper, Allen made biased social media posts about Peterson's case promoting the narrative that Peterson was innocent and his accuser, Ms. Pete, was lying.  On the morning of February 23, 2022—just before Cooper's livestream—Allen and Cooper posted the exact same update to Twitter:  "BREAKING: It was revealed in court few moments ago that Tory Lanez DNA WAS NOT found on the weapon in the Meg Thee Stallion case." (Menillo Decl. Ex. F (Allen Depo. Ex. 131); *id.* Ex. G (Allen Depo. Ex. 132); *id.* Ex. C at 291:17–293:18; 295:6–296:25.)  This was false.  The DNA evidence had not yet been presented in court, and, as Peterson's own defense attorney later admitted, the results were inconclusive—they neither identified Peterson nor ruled him out.  (*Id.* Ex. H (Allen Depo. Ex. 134) at 10:19–12:4; *id.* Ex. C at 291:17–293; 295:3–4.)  Significantly, the DNA evidence was non-public and accessible only to the parties in the criminal prosecution when Cooper and Allen published their identical posts purporting to interpret that confidential document.  (Ex. H at 13:11–15:9; *see also* Ex. C at 289:6–290:13; 303:7–305:22; 307:2–8.)  But circulating these erroneous posts was not merely premature publication:  both Cooper and Allen disseminated false characterizations of evidence months before the trial even began.  Ms. Pete seeks discovery to prove that Peterson or his surrogates leaked that information—and perhaps even suggested the language of the Tweet—to Cooper and Allen.

*Allen's Failure to Cooperate with Discovery:*  On July 22, 2025, Ms. Pete subpoenaed Allen, and on August 22, 2025, she attempted to take his deposition.[2] (*See* Menillo Decl. Exs. B & C.)  Allen appeared via Zoom without counsel and refused to provide meaningful testimony on his common source with Cooper.  When asked about the source behind the Tweet at issue, he flatly refused to answer, insisting "that's something that I would never reveal" unless compelled "under a court order."  (*Id.* at 313:4–10.)  Allen first attempted to shield himself by claiming he was a "journalist," (*id.* at 312:16–313:10), but then conceded that he only considers himself a journalist "at times," (*id.* at 313:11–13), has publicly disclaimed being a journalist, (*id.* at 315:15–18), and admits he invokes the title only when it suits him, (*id.* at 315:19–23).  After the record established that Allen does not qualify as a journalist, he abruptly changed course and claimed he could not recall the very source he had just refused to identify.  (*Id.* at 316:22–24.)

The next day, Allen released a surreptitiously screen-recorded video of the proceeding on various social media platforms, including Instagram and Kick, mocking the process and disclosing questions posed to him.  (Menillo Decl. Ex. E.) And despite admitting that he had material responsive to the subpoena requests he received, Allen has not produced a single document—including his communications

---

[2]    This Motion is properly brought in the jurisdiction of compliance as Allen currently resides in New Jersey.  Fed. R. Civ. P. 37(a)(2).

with Cooper or the very correspondence in which he received the document underlying his February 23rd post on X. (*Id.* Ex. B at 8; *id.* Ex. F.)

Without Allen's testimony identifying his shared source with Cooper—and without the documents he was subpoenaed to produce—Ms. Pete risks being denied access to critical evidence linking Cooper's defamatory campaign directly to Peterson. That evidence is essential to proving Cooper's intent for spreading false and demeaning statements about Ms. Pete.

## **LEGAL STANDARD**

Rule 37(a)(3)(B), permits a party to move "for an order compelling an answer …" where "a deponent fails to answer a question asked under Rule 30 or 31."[3] Fed. R. Civ. P. 37(a)(3)(B)(i). Furthermore, "an evasive or incomplete … answer… must be treated as a failure to … answer." Fed. R. Civ. P. 37(a)(4).

Accordingly, a motion to compel the additional or continued deposition of a deponent will be awarded where the deponent provided evasive and nonresponsive answers to questions. *See, e.g.*, *LifeScan, Inc.*, 2023 WL 7086754, at *7 (granting motion to compel redeposition where deponent provided rote responses or answered

---

[3] "If the motion is granted … the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A); *see also State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 250 F.R.D. 203, 214 (E.D. Pa. 2008) (granting motion to compel deposition testimony where deponent was improperly instructed not to answer certain questions).

questions that had not been asked and "spoke words, but did not provide answers, thereby preventing effective examination"); *GMAC Bank*, 248 F.R.D. at 193 (granting motion to compel deposition where deponent "continually failed to answer questions propounded at his deposition" and gave answers that "were evasive and non-responsive"); *Sperber v. Elwell*, 2014 WL 12621964, *13 (D.N.J. June 26, 2014) (ordering a *pro se* litigant to submit to a continued deposition to answer questions he previously evaded).

Where, as here, the question at issue concerns a claim of privilege, the propriety of that assertion may be determined on Rule 37(a) a motion to compel. *Broadbent v. Moore-McCormack Lines*, 5 F.R.D. 220, 222 (E.D. Pa. 1946); *see also Parker v. Atl. City Bd. of Educ.*, 2017 WL 11466008, *2 (D.N.J. Mar. 7, 2017) (after a deponent invokes the privilege, proper procedure is for party seeking discovery to file a motion to compel).

## I.  ALLEN SHOULD BE COMPELLED TO SIT FOR REDEPOSITION BECAUSE HE CANNOT AVAIL HIMSELF OF PROTECTION UNDER NEW JERSEY'S SHIELD LAW

Allen is not entitled to invoke the journalist privilege and must be compelled to provide testimony on the questions he refused to answer.  By his own admission,

he is not a journalist and cannot meet the elements to qualify for protection under New Jersey's Shield Law.[4]

The Shield Law puts limits on discovery for "a person engaged on, engaged in, connected with, or employed by news media for purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public." N.J.S.A. § 2A:84A-21 (emphasis added); *see also* N.J.R.E. 508 (codifying Shield Law into Rules of Evidence); *Senna v. Florimont*, 958 A.2d 427, 442 (N.J. 2008) (emphasis added) ("New Jersey provides certain free speech protections only to the press"). The witness asserting the privilege has the burden of proving they are a member of the press and therefore qualify for the protections of the Shield Law. *Too Much Media, LLC v. Hale*, 993 A.2d 845, 853 (N.J. Super. App. Div. 2010), *aff'd and modified*, 20 A.3d 364 (N.J. 2011) (The "proponent bears the burden to prove [the privilege's] application to any given situation.").

But "[t]he mere claim that one is a reporter or journalist … is not enough to gain the protection of the Shield Law." *Id.* at 853. Rather, a claimant of the privilege

---

[4] The Florida Court found that Defendant Cooper—who uses social media platforms similar to Mr. Allen—is not a journalist for the purposes of Florida law. *See Pete*, 24-cv-24228, Dkt. No. 36 ("Nothing about this alleged conduct suggests an effort to 'impartially disseminate information. . . [t]he allegations thus depict a campaign, not journalism, and the Court cannot find that Defendant is a media defendant entitled to protection under section 770.01.'") (citations omitted) (citing *Ortega Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1338 (S.D. Fla. 1998) (declining to find that a public-relations firm was a media defendant because it did not "issue unsolicited, disinterested, and neutral commentary")).

must demonstrate:  (1) "a requisite connection to the news media;" (2) "the necessary purpose to gather or disseminate news;" and (3) that "the materials were obtained in the course of professional newsgathering activities."  *In re Jan. 11, 2013 Subpoena by Grand Jury of Union Cnty.*, 75 A.3d 1260, 1270, 1272, 1273 (N.J. Super. Ct. 2013).  Allen cannot meet this burden.  He describes himself as a streamer and entertainer, has publicly disclaimed being a journalist, and admits he only uses that label when it benefits him.  Simply put, Allen's attempt to shield himself behind the press is a pretense, and the Court should reject it.

### A.    Allen Does Not Bear The Requisite Connection to News Media.

Allen's online presence as a "streamer" does not qualify as "news media." The Shield Law was designed to protect the free flow of reliable information vetted through professional journalistic processes—not to shield self-styled online personalities whose content is indistinguishable from message board chatter.  *See Too Much Media, LLC v. Hale*, 20 A.3d 364, 379 (N.J. 2011).  To invoke the privilege, a person must demonstrate a genuine nexus to recognized news media and participation in the news process.  *Id.* at 376.  This is critical:  as the New Jersey Supreme Court cautioned, "self-appointed journalists or entities with little track record who claim the privilege require more scrutiny," and individuals who merely broadcast their own thoughts on social media do not qualify.  *Id.* at 383.

10

Allen is precisely that type of personality. He is not employed by any traditional news organization. Nor does he engage in the processes that define journalism—fact-gathering, verification, or editorial oversight. His work consists primarily of posting opinions, commentary, and "reactions" to existing content, not factual reporting. (*See* Menillo Decl. Ex. C at 313:17–314:20.) And, by his own admission, he has publicly proclaimed that he *is not* a journalist and instead, only considers himself one when it suits him. (*Id.* at 313:11–13, 315:15–23.) He cannot sidestep these admissions to gain access to a privilege for which he does not qualify.

Courts have long recognized the distinction between expressive commentary and news reporting. Allen's content—which solely consists of social media posts containing republished material and reaction videos[5]—falls on the latter side of that distinction, resembling gossip or entertainment chatter rather than journalism. *See e.g.*, *Too Much Media*, 993 A.2d at 857 (self-proclaimed journalist who claimed to investigate and report on the online adult entertainment industry could not invoke the Shield Law for comments she made on an Internet message board). In short, Allen's social media accounts are unfiltered, unscreened spaces for personal expression that lack any safeguards of accuracy or reliability. Extending the privilege to someone like him—simply because he has a large social media

---

[5] A glance at his Instagram or YouTube confirms as much. *See* "King Akademiks," YOUTUBE.COM, https://www.youtube.com/results?search_query=dj+akademiks; "Akademiks," INSTAGRAM.COM, https://www.instagram.com/akademiks/.

11

following and purports to engage in journalism "at times"—would eviscerate its limits and transform it into a blanket shield for entertainers and commentators, contrary to the statute's purpose.

### B. Allen Cannot Demonstrate The Necessary Purpose To Gather Or Disseminate News.

Allen also cannot demonstrate that his content is generated for the purpose of gathering or disseminating news. *Too Much Media, LLC*, 20 A.3d at 382. The Shield Law does not extend to professionals paid to promote specific clients or products. *In re Napp Technologies, Inc. Litigation*, 768 A.2d 274, 279–81 (N.J. Super. Ct. 2000) (holding the Shield Law did not protect witness where purpose "is to *manage* the news rather than to disseminate it" (emphasis added)). Quite unlike professional newspeople, Allen admitted to being paid by artists and record labels to promote songs, music videos, or albums or "a particular artist" more generally. (Menillo Decl. Ex. C at 70:14–71:21; 73:6–14.) Accordingly, his "purpose" is not to gather and share the news. N.J.S.A. § 2A:84A-21a(a). It is for "entertainment" *or* to promote viewpoints and artists based on who will pay him. That is far more akin to "managing" news rather than disseminating it. That will not do.

### C. Allen Did Not Obtain The Underlying Material In the Course of Professional Newsgathering Activities.

Allen cannot show that he obtained the underlying material in the course of professional newsgathering activities.

The Shield Law defines receiving information "[i]n the course of pursuing his professional activities" broadly to include "any situation, including a social gathering, in which a reporter obtains information for the purpose of disseminating it to the public." N.J.S.A. § 2A:84A-21a(h). Though typically, "a certification establishing those points will suffice," the New Jersey Supreme Court has urged that "self-appointed journalists or entities with little track record who claim the privilege require more scrutiny." *Too Much Media, LLC*, 20 A.3d 364 at 383 (cautioning that "the popularity of the Internet has resulted in millions of bloggers who have no connection to traditional media . . .[a]ny one of them, as well as anyone with a Facebook account, could try to assert the privilege"); *see also Union Cnty. Grand Jury Subpoena*, 75 A.3d at 1273 (blogger claiming privilege met third factor only where she provided certification on the nature of why she obtained information).

Allen cannot show entitlement to withhold his source. He has merely proclaimed that he "had an exclusive" and was "going to tweet it any day;" "it didn't matter." (Menillo Decl. Ex. C at 312:16–23.) But that does not meet his burden to establish his "exclusive" was obtained "in the course of professional newsgathering activities. Nor could it. Allen confirmed that his content about the Peterson trial was colored by his pre-conceived opinion that Ms. Pete was a liar and Peterson was innocent. (*Id.* at 107:12–108:14.) And he was a fan of Peterson's before the two even met had a pre-existing friendship with him. (*Id.* at 94:19–95:13; 98:21–99:25.)

13

Allen's purpose has never been to gather or disseminate news, but to broadcast his personal opinions and promote narratives and artists depending on his personal and financial interests. *See supra*, Section B. That was no different during the Peterson trial. He should not now benefit from the Shield Law's protections.

## II.    ALLEN SHOULD BE COMPELLED TO PRODUCE DOCUMENTS RESPONSIVE TO MS. PETE'S SUBPOENA

Allen should also be compelled to produce documents responsive to Ms. Pete's subpoena because he has neither served objections nor offered any justification for his failure to comply, and the deadline to do so has long since passed. A person commanded to produce documents pursuant to a Rule 45 subpoena must serve written objections "before the earlier of the time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B). Allen did not serve any objections within that time, nor has he moved to quash or otherwise sought relief. Having failed to timely object, Allen has waived any basis to withhold responsive documents. *Rucker v. Hunterdon Med. Ctr.*, 2024 WL 4827331, at *2 (D.N.J. Nov. 19, 2024) ("The failure to serve timely objections to a subpoena may constitute a waiver of any such objections."). The Court should order Allen to produce all documents responsive to Ms. Pete's subpoena without further delay.

## <u>CONCLUSION</u>

For the reasons set forth above, Ms. Pete respectfully requests that the Court grant her motion and issue an order: (1) directing Allen to produce documents

responsive to the July 22, 2025 subpoena and sit for a court-supervised, in person, redeposition; and (2) sanctioning Mr. Allen, in the event of non-compliance, in an amount not less than the actual costs incurred by Ms. Pete for bringing this motion and in connection with her efforts to secure his compliance with the subpoena.

Dated:  September 16, 2025

Respectfully submitted,

/s/ *Joanna E. Menillo*

Joanna E. Menillo, Esq. (No. 154842015)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000
joannamenillo@quinnemanuel.com

John O'Sullivan (*pro hac vice* to be submitted)
johnosullivan@quinnemanuel.com
2601 South Bayshore Drive, Suite 1500
Miami, FL 33133
(305) 402-4880

Marie Hayrapetian (*pro hac vice* to be submitted)
mariehayrapetian@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

*Attorneys for Petitioner Megan Pete*

15