# EXHIBIT C

# Deposition Transcript

```
Case Number: 1:24-CV-24228-CMA
Date: August 22, 2025
```

In the matter of:

# MEGAN PETE v MILAGRO ELIZABETH COOPER

# Livingston Allen

# CONTAINS CONFIDENTIAL PORTIONS

Reported by:
ANNETTE ARLEQUIN

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F



1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF FLORIDA

4

MEGAN PETE, an individual,    Civil Action  No.

5
              Plaintiff,       1:24-cv-24228-CMA

6
          v.

7
MILAGRO ELIZABETH COOPER,

8
an individual,

9
          Defendant.

10  _____/

11

12         ZOOM VIDEOTAPED DEPOSITION

13                OF

14           LIVINGSTON ALLEN

15        FRIDAY, AUGUST 22, 2025

16

17

18

19

20

21

22

23  Reported Stenographically by:
    ANNETTE ARLEQUIN, CCR/CSR, RPR, CRR, RSA
24  Steno Job. No. 1925917

25

1

2

3

4

5                August 22, 2025

6                10:00 a.m. (Eastern)

7

8         Zoom video deposition of

9   LIVINGSTON ALLEN, pursuant to Subpoena,

10  before Annette Arlequin, a Certified

11  Court Reporter, a Registered

12  Professional Reporter, a Certified

13  Realtime Reporter, and a Realtime

14  Systems Administrator and a Notary

15  Public of the State of New York, New

16  Jersey and Florida.

17

18

19

20

21

22

23

24

25

1

2    A P P E A R A N C E S: (Remotely)

3

4    QUINN EMANUEL URQUHART & SULLIVAN, LLP

5    Attorneys for Plaintiff

6        295 5th Avenue, 9th Floor

7        New York, New York 10016

8    BY: JOANNA E. MENILLO, ESQ.

9        Email: Joannamenillo@quinnemanuel.com

10       Phone: +1 212-849-7050,

11   BY: ALANAH M. HARRIS, ESQ.

12       Email: Alanahharris@quinnemanuel.com

13   BY: DAN HUMPHREY, ESQ.

14       Email: Danielhumphrey@quinnemanuel.com

15   BY: JULIAN SCHOEN, ESQ.

16       Email: julianschoen@quinnemanuel.com

17   BY: GABBY TREVINO, Paralegal

18

19

20

21

22

23

24

25

```
 1
 2   A P P E A R A N C E S(Cont'd): (Remotely)
 3
 4   DIXON JUSTICE CENTER
 5   Attorneys for Defendant
 6       400 Corporate Pointe, Suite 300
 7       Culver City, California 90230
 8   BY: RONDA DIXON, ESQ.
 9       Email: Ronda@dixonjusticecenter.com
10       Phone: (213) 524-4047
11
12
13   LIVINGSTON ALLEN, Witness, Pro Se
14   Residing at 24 Shallow Brook Road
15   Morganville, New Jersey  07751
16
17   ALSO PRESENT:
18
19   GAVIN GOSLING, Legal Videographer
20
21
22
23
24
25
```

```
 1            L. Allen - Protective Order
 2    defendant in that case?
 3         A.   Yes.
 4         Q.   Okay.  So even though you've been
 5    deposed before, there are a couple of
 6    things I want to go over with you.
 7              The first thing I do want to go
 8    over with you is that I notice that it
 9    doesn't appear to me that there's an
10    attorney here representing you today.
11              Do I have that right?
12         A.   Yeah.  Chilling.
13         Q.   Okay.  Do you have an attorney
14    that typically represents you in matters
15    like this?
16         A.   Yeah.
17         Q.   Okay.  And so you're aware that
18    you're proceeding today without an attorney
19    present?
20         A.   Absolutely.
21         Q.   Okay.  Are you comfortable with
22    proceeding in that fashion?
23         A.   Of course.
24         Q.   Did you talk to any attorney that
25    typically would represent you about today's
```

```
 1          L. Allen - Protective Order
 2    deposition?
 3          A.   No.
 4          Q.   Okay.  So just so the record is
 5    clear, the witness has confirmed that while
 6    he doesn't have counsel present today, he
 7    is comfortable proceeding in the absence of
 8    counsel.
 9          So as I mentioned a moment ago,
10    Mr. Allen, there are a couple of things
11    that I like to go over even though you've
12    been deposed before, just to make sure you
13    and I are on the same page.
14          Is that all right?
15          A.   Sure.  Go ahead.
16          Q.   Okay.  So the very first thing is
17    that the most important person, in my view,
18    in this entire sort of virtual proceeding
19    is the court reporter.
20          And the reason why, as you
21    probably could imagine, is that she has to
22    take down every word that I say, that you
23    say, if Ms. Dixon says anything, she has to
24    make sure that all of that is accounted
25    for.
```

```
 1            L. Allen - Protective Order

 2        A.   I always tell the truth, but yes.

 3        Q.   Okay.  And you understand that

 4    the oath that you took just a moment ago is

 5    the same type of oath that you would take

 6    if you were testifying before a judge or a

 7    jury in a court of law, right?

 8        A.   Absolutely.

 9        Q.   Which is to say that it's

10    testimony under the penalty of perjury,

11    which means if you lie, there are

12    consequences for that.

13            Do you understand?

14        A.   Yes.

15        Q.   Okay.  Now it appears to me that

16    you may be in your recording studio.  I

17    just have a couple of questions about that.

18            Are you in the room alone?

19        A.   Yeah.

20        Q.   Okay.  Do you have a phone or any

21    other device in which you can communicate

22    in front of you?

23        A.   I mean, we're on a computer, so,

24    I mean, I have multiple monitors, so I

25    guess, technically, yes.
```

1              L. Allen - Protective Order

2          Q.   Okay.  So let me break that out a

3     little bit just to -- I make sure I ask all

4     the questions I need to about that.

5              Do you happen to have your phone

6     in front of you?

7          A.   My cell phone?

8          Q.   Yes.

9          A.   No.

10         Q.   Okay.  On your computer, other

11    than this Zoom platform, do you have

12    anything else up in front of you on any one

13    of your multiple monitors that has sort of

14    a messaging function open at this moment?

15         A.   Not at all, no.

16         Q.   Okay.  And can I ask you, for the

17    duration of this deposition, that you not

18    open or communicate with anybody outside of

19    who's here?

20         A.   There's nobody to talk to, but

21    yeah, sure.

22         Q.   Is anybody that you know that's

23    not listed on this participants list

24    joining this meeting or listening in by any

25    other means?

| | |
|---|---|
| 1 | L. Allen - Protective Order |
| 2 | A.   Currently? |
| 3 | Q.   Yes. |
| 4 | A.   No. |
| 5 | Q.   Okay.  Have you set up any sort |
| 6 | of recording device to record this |
| 7 | deposition? |
| 8 | A.   Well, everything in my house is |
| 9 | recorded, so just -- that should be clear. |
| 10 | There's two cameras back there for |
| 11 | surveillance purposes.  There is a running |
| 12 | camera there all the time.  But otherwise, |
| 13 | yeah, no. |
| 14 | Q.   Okay.  And the cameras that are |
| 15 | present in your immediate vicinity, are |
| 16 | they capable of capturing audio and video? |
| 17 | A.   Absolutely. |
| 18 | Q.   Okay.  Do you have any intention |
| 19 | or plans to release a recording of this |
| 20 | deposition to the public after it's |
| 21 | concluded? |
| 22 | A.   I plan on speaking about it and |
| 23 | most likely if I feel the need to, based on |
| 24 | how this goes, unless there is a law |
| 25 | against it, I would definitely use whatever |

CONTAINS CONFIDENTIAL PORTIONS

1          L. Allen - Protective Order

2              Other than the folks that you

3      just mentioned, did you talk to anybody

4      else about the fact that you were being

5      deposed today?

6          A.   Family.  I mentioned on a few

7      interviews -- oh, Adin Ross.  I said --

8      well, I didn't tell him I was being

9      deposed.  I said you guys subpoenaed me.

10     Well, at least at first, and then we missed

11     that date or whatever.

12         Q.   Right.  And that was posted

13     online, that conversation?

14         A.   Yes.  Um-hmm.

15         Q.   Did you talk to -- outside of the

16     context of what was posted online, did you

17     talk to Mr. Ross about the subpoena?

18         A.   Yeah.  He called me saying that

19     you guys tried to, I believe, show up to

20     his house and harassing him.

21             And I told him, I said, hey,

22     typical Roc Nation tactics.

23         Q.   Do you believe that serving legal

24     process of a subpoena is harassing?

25         A.   No, because that's within the

```
 1        L. Allen - Protective Order

 2   context in the confines of what happens in

 3   a civil case.

 4        However, just grabbing random

 5   people that have zero association, and I've

 6   read through this case, with the

 7   allegations being made with zero basis,

 8   just the fact that you could use legally

 9   twist of a arm to get people to come in and

10   sit for a possible seven-hour defamation --

11   or not defamation, a deposition here,

12   testimony, yeah, that's definitely

13   harassment.

14        You don't think that these guys

15   have time -- like, I think my time is

16   valuable just like yours except you're

17   doing your job, I'm lending my time to the

18   justice or the judicial service, I guess.

19        But if I have zero -- if I have

20   zero association with the things being

21   alleged, just like Mr. Ross has zero

22   association with the things being alleged,

23   yeah, you're wasting not only the court's

24   time, but you're harassing people who may

25   be even remotely in a 10-foot or 1,000-foot
```

```
 1          L. Allen - Protective Order

 2     proximity of not only the defendant,

 3     Mrs. Cooper, but definitely a third party

 4     that's not mentioned in a codefendant or

 5     plaintiff's, you know, capacity, Mr. Lanez.

 6          So, yeah, I think it's harassing.

 7     Yeah, there's no other way to think about

 8     it.

 9          Q.   Do you understand that as part of

10     a civil lawsuit, attorneys are allowed to

11     serve third party subpoenas on individuals

12     that they think may have discoverable

13     information related to the case in one way,

14     shape or form?

15          A.   Yes, I understand that.  But

16     also --

17          Q.   Okay.  Do you know the basis for

18     why Ms. Pete is seeking the deposition of

19     Mr. Ross?

20          A.   No.

21          Q.   Okay.  So you don't actually know

22     whether or not there's zero basis or

23     adequate basis or sufficient basis or more

24     than that to seek the deposition of

25     Mr. Ross, right?
```

```
 1            L. Allen - Protective Order
 2        A.   Well, speaking with him, and I've
 3    been the liaison to, you know, connect
 4    them, whether it was a stream or whatever
 5    before.  He had limited conversations or
 6    even association with Mr. Lanez and doesn't
 7    know who the defendant is and has never
 8    spoken with the plaintiff.
 9            So it's kind of, like, all right.
10            I guess it's -- the equivalent of
11    what you're saying is like saying, do you
12    know that the police could pull you over
13    because you're driving on the road.  But if
14    they pull you over every block, is it
15    harassment or do they have the right to?
16            So you're right, you have the
17    right, but it --
18        Q.   Mr. Allen, I don't --
19        A.   -- you have the right.
20        Q.   -- think I'm saying.  I don't
21    think I'm saying anything.  I'm just asking
22    you questions.
23            So you're free to answer my
24    question in the manner that you deemed fit,
25    but it was just a simple question of
```

```
 1        L. Allen - Protective Order
 2   whether or not you knew what was in
 3   Ms. Pete's head when she was serving
 4   subpoenas on individuals, and I take it
 5   that you do not, right?
 6        A.   I don't read minds.  You're
 7   right.
 8        Q.   Okay.  And Mr. Ross told you that
 9   he believed that Ms. Pete was trying to
10   serve a subpoena for his deposition on him
11   just like we served a subpoena on you,
12   right?
13        A.   Well, he was just instructed by
14   his security people that there was an
15   attempt.
16        Q.   Okay.
17        A.   When they asked him what it was
18   about, they mentioned Quinn Emanuel, the
19   firm you work at.
20        And this was right after I told
21   him on a live stream that I got subpoenaed.
22        He said:  Do you know what that's
23   about?
24        And I think they mentioned
25   Mrs. Cooper, but he had zero idea who she
```

1          L. Allen - Protective Order

2    you know, one of my headquarters, but I

3    don't know if they're actually still there

4    or what's happened to them.

5          But do I have them immediately

6    here, no.

7          Q.   Okay.  So would you consider

8    yourself to be a streamer?

9          A.   I consider myself to be a

10   streamer, a blogger, media personality,

11   broadcaster, media company owner,

12   everything.  So that would be fair.

13         Q.   And that makes -- and that's how

14   you make your living, right?

15         A.   Yeah.

16         Q.   How long have you been doing

17   that?

18         A.   About 15 years.

19         Q.   And I know that you're sort of

20   public name is DJ Akademiks.

21         Were you at one time a DJ?

22         A.   Yes.

23         Q.   Do you still do that at any point

24   in time?

25         A.   Rarely, but at times.

```
 1          L. Allen - Protective Order

 2        Q.   How did you decide to get into

 3   the realm -- I'm just going to call it

 4   "streaming" so that we don't have to go

 5   through all the delineations of what it

 6   could be confirmed, if that's okay with

 7   you?

 8        A.   Okay.

 9        Q.   Okay.  So how did you decide to

10   get into that line of work?

11        A.   It was a natural progression.

12   Started out DJing around 2009.  That became

13   me -- first of all, it's not obvious by

14   the -- well, I guess the court reporter

15   can't type a physical thing.

16          It was a Jamaican flag back --

17   I'm Jamaican.  So, anyway, in Jamaican

18   culture, the DJ is also usually the voices

19   of the culture.  So I started DJing back in

20   college.  I got on the college radio

21   because I felt that it needed to be like a

22   necessary part of, like, my career.

23          That turned into me wanting to

24   get on radio.  Eventually I stopped DJing

25   as much, as I started putting out videos
```

```
 1        L. Allen - Protective Order

 2   online, kind of developing a platform, and

 3   I started streaming around 2013 or 2014.

 4   That was a way of me trying to find my core

 5   group of supporters and followers.

 6            And then eventually that turned

 7   into the lay of the land, so to speak, in

 8   the sense of the business structure of how

 9   people were now consuming content turned to

10   streaming.  So there became a lot more

11   people checking out streams.

12            (Counsel inaudible.)

13            MS. HARRIS:  We couldn't hear

14       that question, Joanna.

15       Q.   What type of content do you

16   typically stream about?

17       A.   Music, urban topics, hip-hop

18   specifically, music industry stuff.  That

19   kind of encompasses everything.

20       Q.   Do you consider yourself to be an

21   influencer?

22       A.   I guess technically by the word,

23   sure, yes.

24       Q.   So would you agree with me that

25   your post or your content can have an
```

```
 1          L. Allen - Protective Order
 2    impact publicly?
 3          A.   Yes.
 4          Q.   And it can impact public
 5    perception?
 6          A.   Yes.
 7          Q.   And you can influence
 8    conversations online?
 9          A.   Yes.
10          Q.   Change minds of the public?
11          A.   Not necessarily change minds, but
12    influence.
13          Q.   And you can persuade people,
14    right?
15          A.   Yes, but it's --
16              MS. DIXON:  Objection as to form.
17          Q.   You can answer.
18          A.   Still I believe it's up to the
19    person to change their mind given the
20    information, but could that information be
21    influential, yes.
22              However, being able to change
23    someone minds, I wish I would be able to do
24    that.  I got a couple minds I want to
25    change.
```

```
 1        L. Allen - Protective Order
 2   information?
 3        A.   Roc Nation.
 4        Q.   Go ahead.  Why don't you give me
 5   the list and then we'll go through it.
 6        A.   Well, we're not going to sit here
 7   and name labels for years.  Roc Nation, a
 8   lot of UMG-associated record labels, a lot
 9   of Sony-associated record labels.  But, I
10   mean, there's hundreds under both
11   companies.  So Sony has hundreds.  UMG has
12   hundreds.  And, of course, Warner, there's
13   hundreds as well.
14        Q.   Okay.  Any entertainer
15   specifically -- in addition to, like, a
16   record label, has any entertainer or artist
17   ever paid you to post specific content?
18        A.   I'm going to say no in the
19   context of even if an artist, let's say, I
20   don't know, say, there was an artist that
21   paid me that wasn't under one of those
22   record labels I'm telling you, I chalk it
23   up as a record label because they're paying
24   me for music.
25            So, primarily, the payments have
```

1        L. Allen - Protective Order

2    been all to do with, hey, I want to promote

3    a song.  I want to promote my music video.

4    I want to promote my album.  That's pretty

5    much is what it is.

6            We don't take payments for don't

7    talk about my arrest, don't talk about me

8    beating my baby momma, don't talk about me

9    lying about sleeping with this guy or this

10   girl.  We don't do that.

11           Yeah.

12       Q.   Who are some of the artists that

13   have paid you that even though you chalk

14   them up to coming from the record label?

15           Who are some of the artists that

16   have said, hey, I want you to promote my

17   music?

18       A.   Well, so now we're -- I guess

19   we're talking about independent artists

20   because usually everything with labels,

21   there's usually a funnel to deal with that.

22           Like, okay, let me see.

23           You're looking for examples?

24       Q.   Yeah.

25       A.   Okay.  I mean, now I feel like

CONTAINS CONFIDENTIAL PORTIONS

1        L. Allen - Protective Order

2        A.   I feel you're a little bit

3    hyperbolic there.

4        Q.   I understand.

5            (Simultaneously speaking.)

6        Q.   Is that what you were referring

7    to?  When you said earlier, like, every,

8    you know, record label, you know, under the

9    sun hyperbolically has sort of paid you in

10   one way, shape or form to promote a

11   particular artist of theirs, is that what

12   you meant when you said online that you've

13   pimped the entire music industry?

14       A.   Oh, absolutely.

15       Q.   Okay.  And I think in that same

16   post, you said, "I could tell you ten

17   artists that tried to pay me."

18           Do you remember saying that?

19       A.   Finish your question or finish

20   the statement?

21       Q.   Yeah.

22           You said, "I could tell you ten

23   artists that tried to pay me," when you

24   were talking about the various ways that

25   you've pimped the music industry?

CONTAINS CONFIDENTIAL PORTIONS

```
 1          L. Allen - Protective Order
 2    streaming, have our content be visible.
 3            That's it.  While live streaming.
 4            Now if that content is repurposed
 5    or, say, there's a random clip of someone
 6    falling off a bike that gets posted with a
 7    Stake logo, I don't have any contractual or
 8    working relationship with Stake that
 9    actually deals with that.
10        Q.   Okay.  Do you still maintain the
11    relationship with Stake as you've described
12    having it in the past?
13        A.   Yeah.  I still have a descent
14    relationship with them, yes.
15        Q.   Okay.  So you still, as you're
16    streaming, will have their logo in display
17    or on view?
18        A.   At times, yes.
19        Q.   Okay.  When did you first meet
20    Tory Lanez?
21        A.   First met Tory Lanez...it's,
22    like, such a long time ago.  I kind of
23    almost want to say, like, 2000 and -- it
24    might have been like, crap, how long I've
25    been doing this, like, maybe '18, '19?
```

```
1            L. Allen - Protective Order
2        Q.   Did you know who he was before
3    you met him?
4        A.   Yes, he was a wildly successful
5    music star, someone who I enjoyed his music
6    a lot and someone who was very ambitious in
7    trying to get the eyes, ears and attention
8    of not only fans, but even challenged some
9    of the top rappers including my favorite
10   top rapper, which was Drake.
11       Q.   Were you a fan of Tory Lanez's
12   music before you met him?
13       A.   Yeah, of course.
14       Q.   When you first had occasion to
15   meet him, was that a result of him reaching
16   out to you or somebody on his team reaching
17   out to you or you reaching out to his team?
18       A.   They invited me to, I believe, a
19   show.  And I believe that's the first time
20   I met him.  I think it was a show.  And the
21   show was at, like, S.O.B.'s.  S.O.B.'s a
22   nightclub, or used to be.  I don't know
23   what it is now.  It's a particular venue in
24   New York City.
25       Q.   And did you get to meet him
```

```
 1            L. Allen - Protective Order
 2     relationship developed because you were
 3     able to hit it off so well.
 4            Is that about a fair
 5     approximation of what you were saying
 6     before?
 7        A.   Yes.
 8        Q.   So you guys had occasion to go to
 9     dinner?
10        A.   Never went to dinner.
11        Q.   Okay.  Well, did you have
12     occasion to hang out with one another
13     outside of any sort of professional
14     context?
15        A.   Yeah, yeah, I've gone to the club
16     with him.  I've been to, like, his
17     penthouse in Miami.
18        Q.   Would you say that you -- I'm
19     sorry.
20        A.   Go ahead.
21        Q.   I was going to say, would you say
22     that you have a close personal relationship
23     with him?
24        A.   Well, it depends on what we're
25     talking about.  So I would say I know him
```

```
 1          L. Allen - Protective Order
 2     more than most rappers.  I wouldn't say
 3     that we're best friends.  Like, I'm pretty
 4     sure, I'm on the list of people that he
 5     would call if he had a problem or issue or
 6     he needed someone to talk to.  Unless it
 7     was music in nature, he's probably not
 8     calling my phone.
 9          So it was one of those people
10     where, like, you know how you have work
11     friends and then you have that one friend
12     that you might invite out to the club, but
13     you won't go everywhere with them.
14          So it's like -- he's like a work
15     associate that is a little bit closer than
16     others because we have hung out in other
17     capacities, yeah.
18          But would I say I'm one of his
19     closest and bestest friends, absolutely
20     not.  Would I say he's the same to me,
21     absolutely not.
22     Q.   But would you consider him a
23     friend nevertheless, even if not a close
24     friend?
25     A.   Yeah, yeah, yeah, of course,
```

CONTAINS CONFIDENTIAL PORTIONS

1          L. Allen - Protective Order

2      was a lot of doubt that I thought was more

3      than reasonable.  So under that premise, I

4      don't see or I couldn't stand behind a

5      decision to put somebody in jail for ten

6      years, when there is more than what I

7      believe is reasonable doubt that he didn't

8      commit these crimes.

9          So, you know, from there, I'm not

10     going to agree with any type of

11     incarceration of him.

12         Q.   Did you reserve your opinion with

13     respect to whether or not you thought that

14     there was sufficient evidence to sustain a

15     conviction against him until after the

16     trial concluded or did you speak on it

17     during the duration of the trial?

18         A.   Oh, definitely spoke on it during

19     the duration.  When people watching me give

20     an opinion or cover a trial, it's

21     definitely rooted in how I see it mixed

22     with, hey, listen, these are the facts.

23         But as we all know, a lot of

24     times facts could, depending on how you put

25     them, in what order, and who the facts

CONTAINS CONFIDENTIAL PORTIONS

```
 1        L. Allen - Protective Order
 2    supposedly are coming from, or even the
 3    testimony, it could really -- the person
 4    who's receiving those things could go
 5    either way.
 6        So I always have an opinion and
 7    point of view.  So from the get-go, I
 8    definitely thought, hey, listen, this is a
 9    crock of BS -- and, yes, that means
10    bullshit -- from the get-go, where the
11    victim was supposedly -- I feel like she
12    was just lying.  I felt like she was an
13    habitual liar.  I felt like she couldn't
14    tell the truth to save her life.
15        And then now when it relied on
16    her testimony, along with a couple other
17    things from what I had seen, but her
18    testimony definitely was an important --
19      Q.   Just to interject -- just to
20    interject real quick.
21        When you say "a couple other
22    things," you mean other evidence that was
23    admitted at trial and considered by the
24    jury during the criminal trial, right?
25      A.   Yes.
```

```
 1        L. Allen - Protective Order

 2    publicly posted on Instagram that Kelsey

 3    did not shoot Ms. Pete?

 4        A.   Tory posted that?

 5        Q.   I'm asking you if you're aware?

 6        A.   I know his account posted it.  Is

 7    it Tory?

 8        Q.   Are you aware of somebody else

 9    running Mr. Lanez's account on his behalf?

10        A.   I'd be surprised if Tory runs his

11    account even a quarter of the time.  Tory

12    Lanez, like many other artists, when I

13    communicate with them, especially via,

14    like, say, DMs or something like that, it

15    could be any host of people.

16            I'm still talking to a deceased

17    person, King Von.  His Instagram messages

18    me all the time because his manager runs

19    that account.

20        Q.   Do you believe --

21        A.   I don't know who's running it.

22        Q.   Do you believe -- Mr. Allen, do

23    you believe that somebody who's managing or

24    running Tory Lanez's account for him

25    posted, that's not true, when another
```

CONTAINS CONFIDENTIAL PORTIONS

1    L. Allen - Protective Order

2    person posted online that Kelsey was the

3    shooter?

4        MS. DIXON:  Objection as to form.

5      A.   So I actually believe it's one of

6    two things, right?

7        I believe it wasn't -- that's not

8    Tory on the account.

9        Or I think this is more the

10   reasonable belief.  I think, to keep it

11   real, Kelsey did it and Tory been trying to

12   protect Kelsey.  I don't know why he won't

13   tell who her.  I would have been told on

14   her.  That's the facts.  You know what I

15   mean?

16       Like I would have been told --

17   but I think he's -- Tory's not a gang

18   member.  He's -- like he's a guy who's,

19   like, kind of like quasi-street and I think

20   he's been always like, hey, I got to not be

21   as forthcoming with this information.

22       And, trust me, I listen to all

23   the interviews he had with the police

24   because I wanted to hear him.  Like usually

25   when people get in trouble and feet is to

1           L. Allen - Protective Order

2      the fire, you just say it and he was always

3      this vague and I get it.

4               He's a guy who believes we don't

5      speak about certain things that could be

6      criminal in nature, whatever, whatever, and

7      if you ask me based on -- again, remember

8      you're asking my opinion here -- I think if

9      Tory was shooting Meg, Meg be dead.

10              We're talking about somebody's

11     who's alive and twerking.  I think she be

12     dead.  I think what happened is she was

13     fighting with her friend over the fact that

14     they were in a triangular relationship.

15     Somehow the gun got into play.  If Tory's

16     trying to shoot her, I believe she'd be

17     dead.  He's not missing five shots, I

18     believe.

19              So I believe what that indicates

20     to me --

21         Q.   Mr. Allen --

22         A.   -- also --

23         Q.   Mr. Allen --

24         A.   Say again?

25         Q.   How badly do you believe that the

```
 1         L. Allen - Protective Order
 2    like, wait, you just came out and just said
 3    this girl did the shooting?  Hey, what most
 4    rappers --
 5         Q.   So, Mr. Allen, just so that I got
 6    it straight, you believe this man is doing
 7    a ten-year bid for Kelsey when she's the
 8    one who shot Megan Thee Stallion?
 9         A.   Ma'am, there's a lot of people in
10    black culture that do that.  He comes and
11    emanates from that type of place, yes, I
12    believe he -- I think he's stupid, trust
13    me.  I think it's stupid.
14         You know what I mean?  Like him
15    and Kelsey should have bunk beds if it was
16    going to be that.
17         But I do believe that in reality,
18    he was not as forthcoming, he was not
19    helpful at all in the investigation, and
20    once the investigation targeted him, he
21    thought he was protecting her because he's,
22    like, hey, no way they're going to be able
23    to say I did it.
24         And then they -- it was able to
25    be at least proven, at least according to
```

```
 1           L. Allen - Protective Order

 2     the jury, and that's where he is -- that's

 3     why he is where he is.

 4           Q.   Did he ever tell you that that's

 5     what happened?

 6           A.   He never told me, that's the

 7     thing.  He refused to tell me anything that

 8     was in --

 9           Q.   Okay.  Did anybody who was

10     actually present on the night in question

11     when Ms. Pete got shot actually tell you

12     that that's the story?

13           A.   No, but just like most people

14     online, we have to use our own common

15     sense.  We have no video.

16           Q.   Right.  What you do is you sit

17     and you -- what you do is you sit and you

18     speculate, right?

19           A.   Yes.  And that's --

20           Q.   So everything that you just said

21     was a whole lot of speculation, right?

22           A.   Absolutely.

23           Q.   Okay.  Because you have no have

24     basis in any admissible form to support

25     anything that you just said, right?
```

```
 1          L. Allen - Protective Order
 2     know, based on some of the -- the context
 3     and observations that other people made
 4     that was given to me.
 5          So, yeah, I felt it was an odd
 6     trial, something that we needed eyes and
 7     ears on the ground.
 8       Q.   And there were eyes and ears on
 9     the ground, weren't there, whoever the
10     spectators were that were already in the
11     courtroom?
12       A.   Yeah.  And even --
13       Q.   And as we know, Ms. Cooper was
14     there every day and she was reporting on
15     what she was hearing at the trial?
16       A.   Amazing set of eyes and ears.
17       Q.   Do you -- are you aware that she
18     was taking notes every single day during
19     the trial?
20       A.   She told me that every time we
21     got online.
22       Q.   Do you remember earlier this
23     morning, Mr. Allen, I asked you whether or
24     not you had any phone in front of you or
25     any application open on your computer that
```

```
 1          L. Allen - Protective Order

 2     would facilitate any sort of messaging?

 3          A.   Yes.

 4          Q.   And I asked you to try and

 5     refrain from that during the course of the

 6     deposition?

 7          A.   Yes.

 8          Q.   Okay.  Do you believe that

 9     posting on social media is a form of

10     messaging?

11          A.   Not messaging an individual.

12          Q.   Okay.

13          MS. MENILLO:  Alanah, can we mark

14     as Exhibit 129 [sic], Tab 101.

15          MS. HARRIS:  Yes.  It's

16     Exhibit 130.

17          (Plaintiff's Exhibit 129, DJ

18     Akademiks Post titled "Trial Starts

19     today! DJ Akademiks does a deep dive on

20     the Meg & Tory Case! Goes through the

21     timeline," not Bates-stamped, marked

22     for identification, as of this date.)

23          (Plaintiff's Exhibit 130,

24     Akademiks TV Twitter post, not

25     Bates-stamped, marked for
```

CONTAINS CONFIDENTIAL PORTIONS

1        L. Allen - Protective Order

2        identification, as of this date.)

3    BY MS. MENILLO:

4        Q.   Do you recognize Exhibit 130,

5    Mr. Allen?

6        A.   I do.

7        Q.   This is a tweet that you sent

8    today?

9        A.   I didn't send that tweet.

10       Q.   Well, iamakademiks, the original

11   tweet, that's your Instagram account,

12   right?

13       A.   It's not a tweet.

14       Q.   Okay.  So you posted on your

15   Instagram account during the course of this

16   deposition?

17       A.   Yeah, definitely during the

18   break, yes.

19       Q.   Okay.  Which break was that?

20       A.   One of the breaks or lunch or one

21   of the times.

22       Q.   Okay.  And you wrote, "This

23   deposition meg thee stallion got me in

24   asking me about Tory, Drake and Nicki Minaj

25   more than their client Meg the stallion"

1          L. Allen - Protective Order

2    and I think that's three laughing-crying

3    emoji faces, right?

4          A.  Yes.  Yes, indeed.

5          Q.  Okay.  And then you quote as if

6    you're saying something I said, right?

7          A.  Well, I didn't attribute it to

8    you, but I did put things in quotation.

9          Q.  Right, but you put it in

10   quotations to suggest as -- as if these are

11   the questions you're being asked, right?

12         A.  I didn't -- you're putting words

13   in my mouth at that point.

14         Q.  Okay.  So then why don't you tell

15   me what the purpose of you putting quotes

16   in your Instagram account around these

17   phrases was?

18         A.  Because I wanted people to

19   understand the subject matter I was being

20   questioned on.  Is Drake paying you?  Is

21   Nicki paying blogs?  Is -- who is this

22   grand wizard guy?  And is Tory sending you

23   money on Cash App?

24         Actually, I meant to put a couple

25   of more things for -- to -- I don't know

```
 1           L. Allen - Protective Order
 2    what you --
 3           Q.   So just so that I get it clear,
 4    we had a whole conversation this morning
 5    about how there are aspects of this
 6    deposition that may be kept confidential,
 7    and you couldn't even wait until the
 8    deposition was over before you started
 9    posting about it on social media?
10           A.   Well, I mean, y'all even invite
11    me to a --
12           Q.   It's a "yes" or "no" question.
13           A.   Oh, sure.
14           Yeah.
15           Q.   Okay.  And so what you wrote here
16    was, "U sure Drake ain't pay u?"
17           Right?  That's the first thing?
18           A.   Can I use my phone on a break?
19           Q.   You're allowed to use your phone
20    on a break.  There's nothing prohibiting
21    it, but since you did it, I'm going to ask
22    you about it.
23           So you wrote, "U sure Drake ain't
24    pay U?"  Right?
25           A.   That was a hilarious question or
```

```
 1          L. Allen - Protective Order

 2              A DNA report?  I didn't get a DNA

 3      report.

 4          Q.   So I didn't ask you whether you

 5      got a DNA report.

 6              I asked whether you got

 7      information about a DNA report before it

 8      was publicly available.  Did you?

 9          A.   I did.

10          Q.   Okay.  And you know that because

11      you received that information early, that

12      the Los Angeles Police Department at a

13      point in time conducted a DNA analysis on

14      the weapon that was used to shoot Megan

15      Thee Stallion, right?

16          A.   Yeah.

17          Q.   And you understand that that

18      information was shared among the attorneys

19      and the parties to the criminal trial,

20      right?

21          A.   Yes.

22          Q.   And like you and I have talked

23      about this morning, in that case, that

24      information was subject to a protective

25      order, right?
```

```
 1              L. Allen - Protective Order
 2        A.   Yeah.
 3        Q.   Which means it wasn't supposed to
 4   be released publicly at that time, right?
 5        A.   Yes.
 6        Q.   But you received that information
 7   before it was supposed to be released
 8   publicly, right?
 9        A.   I absolutely did.
10        Q.   And in other words, while it was
11   still subject to the protective order,
12   right?
13        A.   Yes.
14        Q.   And under the protective order,
15   the only parties who had access to it was
16   Tory, his attorneys, and the prosecutors,
17   right?
18        A.   You're telling me.  I wouldn't
19   know.
20        Q.   Well, you followed the story
21   after you wrote about it, right?
22        A.   Yeah, but I'm not sure everybody
23   who would be privy to know the details or
24   every detail or a detail on that protective
25   order of that particular piece of
```

```
 1            L. Allen - Protective Order
 2    discoverable evidence.
 3        Q.   You were certainly not supposed
 4    to be privy to it at that point in time,
 5    right?
 6        A.   That's a fair assumption.
 7        Q.   It's a fair statement, not an
 8    assumption, right?
 9        A.   Well, I'll just assume because I
10    never seen the protective order.
11        Q.   Okay.  You knew at the point in
12    time that you received the DNA -- did you
13    know at the point in time that you received
14    the information about the DNA report, that
15    you weren't supposed to have it?
16        A.   I didn't know at the time, no.
17            MS. MENILLO:  Let's mark as the
18        next exhibit, Tab 19.  I think it's
19        Exhibit 131.  And while that is being
20        marked, I'll ask you a question,
21        Mr. Allen.
22        Q.   On February 23rd, 2022, you and
23    Ms. -- excuse me -- Cooper both took to
24    social media to talk about the DNA report.
25            Do you recall that?
```

```
 1          L. Allen - Protective Order
 2      A.   I don't know what she did on that
 3   day.  I did go to social media at a point.
 4   I don't know what particular day.
 5      Q.   Okay.
 6          MS. MENILLO:  So let's pull up
 7      Exhibit 131, please, Alanah.
 8          (Plaintiff's Exhibit 131,
 9      Akademiks TV Post, Bates-stamped
10      Pete_0003443, marked for
11      identification, as of this date.)
12   BY MS. MENILLO:
13      Q.   This is -- the @Akademiks is your
14   Twitter account, right?
15      A.   That is.
16      Q.   And this is the one -- one of the
17   ones that we spoke about this morning that
18   you said that you operate, right?
19      A.   I remember writing that tweet
20   like it was yesterday.
21      Q.   Okay.  And for the sake of the
22   record, this tweet is dated February 23rd,
23   2022, and you posted it at 11:43 a.m.,
24   right?
25      A.   Yep.
```

1          L. Allen - Protective Order

2          Q.   And based on your comment a

3     moment ago, I have to ask this odd

4     question, but you do recognize this tweet,

5     right?

6          A.   Yes.

7          Q.   And you did, in fact, send this

8     tweet, correct?

9          A.   Yes.

10         Q.   And the tweet reads:

11    "BREAKING" -- in all caps -- "It was

12    revealed in court a few moments ago that

13    Tory Lanez's DNA WAS NOT found on the

14    weapon in the Meg Thee Stallion case,"

15    right?

16         A.   Yeah.

17         Q.   I'm sorry, did you say?

18         A.   Yes.

19         Q.   Yes?

20              You later deleted this tweet,

21    correct?

22         A.   Yes.

23         Q.   Why did you delete it?

24         A.   Because everyone on social media

25    turned to investigators and they were

1        L. Allen - Protective Order

2    opposite of accurate, cool, sure.

3        Q.   So that's a yes to my question,

4    it was false, right?

5        A.   Sure.

6        MS. MENILLO:  Okay.  Let's mark

7    as Exhibit 132, Tab 41, please.

8        (Plaintiff's Exhibit 132,

9    Milagro_Gramz Tweet, Bates-stamped

10   Pete_0002289, marked for

11   identification, as of this date.)

12       MS. MENILLO:  And you can pull it

13   up whenever you're ready, Alanah.

14   BY MS. MENILLO:

15       Q.   Have you seen this tweet before,

16   Mr. Allen?

17       A.   Never.

18       Q.   Okay.  I'll represent to you that

19   it's a tweet from Ms. Cooper on

20   February 23rd, 2022, which is the same day

21   that you sent the tweet that we just looked

22   at, right?

23       A.   Sure.

24       Q.   Well, you saw that Exhibit 131

25   had a date of February 23rd, 2022, correct?

CONTAINS CONFIDENTIAL PORTIONS

```
 1        L. Allen - Protective Order

 2        A.   I didn't look at the date, but,

 3   yeah, I'll take your word for it, sure.

 4        Q.   Okay.  And you see that she

 5   wrote, "BREAKING" -- in all caps -- "It was

 6   revealed in court few moments ago that Tory

 7   Lanez DNA WAS NOT found on the weapon in

 8   the Meg Thee Stallion case."

 9        Do you see that?

10        A.   Yes.

11        Q.   And that's the exact same

12   language from your tweet on the same day,

13   isn't it?

14        A.   It seems to be.

15        Q.   And just for the record, this is

16   a tweet that was sent out at 11:48 a.m.,

17   right?

18        A.   Do you know what time mine was

19   sent out.

20        Q.   11:43 a.m.

21        A.   It sounds right.

22        Q.   Okay.  So it appears that

23   Ms. Cooper copied your tweet and sent it

24   out herself, right?

25        A.   Yes.
```

CONTAINS CONFIDENTIAL PORTIONS

 1        L. Allen - Protective Order

 2    court, I wouldn't know the times.  So --

 3        Q.   Okay.

 4            MS. MENILLO:  Why don't we

 5    scroll.  Zoom in a little bit, please,

 6    Alanah.

 7        Q.   For the record, Mr. Allen, I'm

 8    showing you Exhibit 134.  This is a portion

 9    of the transcript from a hearing that was

10    held --

11            MS. MENILLO:  -- scroll up,

12    Alanah, please --

13        Q.   -- on February 23rd, 2022.

14            Do you see the document in front

15    of you?

16        A.   Yep.

17        Q.   And this was a hearing that was

18    held in court on Mr. Lanez's criminal

19    trial.

20            Can you tell that from the top of

21    the page?

22        A.   Yes.

23        Q.   Okay.  And you can see that this

24    is the same day that you tweeted

25    information about the DNA report, right?

CONTAINS CONFIDENTIAL PORTIONS

```
1            L. Allen - Protective Order
2        A.   Yes.
3        Q.   And it's also the same day that,
4    as we just saw, Ms. Cooper tweeted
5    information about the DNA report, right?
6        A.   Yes.
7        Q.   And it's -- the individual, as
8    you can tell from the top, who's speaking
9    here is Shawn Holley.
10           Do you see that?
11       A.   Yes.
12       Q.   And as we discussed earlier, you
13   understand that Shawn Holley was one of
14   Mr. Lanez's criminal defense attorneys in
15   the criminal trial, right?
16       A.   Yes.
17       Q.   Okay.  And you've -- have you
18   seen this transcript before?
19       A.   No.
20       Q.   Have you heard about what
21   happened during this court appearance
22   before?
23       A.   I heard -- I did.  I did.
24       Q.   And you can see here, she says,
25   "I can say to you that in my reading of
```

1          L. Allen - Protective Order

2     what DJ Akademiks -- again, I don't know

3     who that is.  I don't know that any of our

4     jurors will know who that is or really what

5     he has tweeted."

6          Do you see that?

7     A.   I definitely do.

8     Q.   Can you tell from the context of

9     her statements that you sent the tweet

10    before this hearing occurred?

11    A.   She's indeed referring to that

12    tweet, yes.

13    Q.   And to answer my question, it was

14    that the tweet was -- it was sent before

15    this hearing occurred, right?

16    A.   Most likely.

17    Q.   Okay.  And she says, "I didn't

18    [sic] even know the medium in which he

19    operates -- but what he said isn't

20    correct."

21          Do you see that?

22    A.   I do see it.

23    Q.   And just to be clear, we're

24    talking about Tory Lanez's attorneys in the

25    criminal case saying that the tweet that

1          L. Allen - Protective Order

2          Q.   Okay.  But you can take away from

3     this at least that she is suggesting and

4     telling a court and she is representing to

5     the court that what you tweeted about the

6     DNA report is incorrect, right?

7          A.   Yeah, it seems to be that -- to

8     be the case, yes.

9          Q.   Do you have any reason to believe

10    that what she was telling a court, as an

11    officer of the court -- which is what

12    lawyers are -- was false?

13         A.   Yes, I do.  I mean, Tory said

14    the --

15         Q.   Do you have any reason to believe

16    that your interpretation, as somebody who

17    is not a lawyer, not a forensic scientist,

18    has no experience with litigation, has

19    superior knowledge of how to interpretate

20    [sic] DNA evidence than a criminal defense

21    attorney?

22         A.   Yeah.  She's not an expert

23    either.  Of course, Tory said --

24              (Court reporter clarification.)

25         A.   Tory said this same lawyer was

| | |
|---|---|
| 1 | L. Allen - Protective Order |
| 2 | Alanah, and we'll pull up the |
| 3 | recording. |
| 4 | (Plaintiff's Exhibit 135, Video |
| 5 | clip, marked for identification, as of |
| 6 | this date.) |
| 7 | (Plaintiff's Exhibit 136, |
| 8 | Document titled "2022.02.2.34-O_Truths |
| 9 | Capture of MilagroGramz Stationhead," |
| 10 | not Bates-stamped, marked for |
| 11 | identification, as of this date.) |
| 12 | MS. HARRIS:  Sure. |
| 13 | BY MS. MENILLO: |
| 14 | Q.   And for the record, this is a |
| 15 | livestream from Ms. Cooper on |
| 16 | February 23rd, 2022. |
| 17 | And even though this was publicly |
| 18 | posted, this version of it, Mr. Allen, was |
| 19 | exchanged between the parties and is |
| 20 | subject to the protective order. |
| 21 | MS. MENILLO:  You can play it, |
| 22 | Alanah. |
| 23 | (Video playing.) |
| 24 | BY MS. MENILLO: |
| 25 | Q.   Mr. Allen, do you recognize that |

```
 1          L. Allen - Protective Order
 2      Q.   In that clip, Mr. Allen, you
 3   heard Ms. Cooper speaking about you, right?
 4      A.   Yes.
 5      Q.   And the tweet that you sent out
 6   about the DNA report, correct?
 7          Is that a yes?  I'm sorry, I
 8   didn't hear you.
 9      A.   Yes.
10      Q.   Okay.  And she said that she
11   believed that you had put it out
12   prematurely, right?
13      A.   Yes.
14      Q.   And that's because it wasn't
15   supposed to be public at the time, right?
16      A.   I had no idea why she's saying
17   that.
18          MS. MENILLO:  Okay.  You can
19      press play, Alanah.
20          (Video playing.)
21   BY MS. MENILLO:
22      Q.   You hear towards the end of that
23   video, Mr. Allen, Ms. Cooper is saying that
24   you and she had the same sources of
25   information?
```

```
 1          L. Allen - Protective Order
 2      A.   I heard.
 3      Q.   And did you hear her say that you
 4  were given the information and you spoke on
 5  it too soon?
 6      A.   I heard.
 7      Q.   And did you understand that to
 8  mean that she believed, as she said
 9  earlier, that you had prematurely shared
10  information about the DNA report?
11      A.   That sounds fair.
12      Q.   Okay.  Do you and Ms. Cooper
13  share the same sources, as it relates to
14  Tory Lanez?
15      A.   I wouldn't know.
16      Q.   So you don't believe that you and
17  Ms. Cooper have the same sources of
18  information?
19      A.   No, I don't even think she had a
20  source.
21          I think -- hey, listen, I had an
22  exclusive.  I was going to tweet it any
23  day.  It didn't matter.  Also it had
24  nothing to do with Ms. Megan Pete.  I don't
25  know why she --
```

CONTAINS CONFIDENTIAL PORTIONS

1       L. Allen - Protective Order

2       Q.   When did the exclusive come --

3    who did the exclusive come from?

4       A.   That's something I would never

5    reveal.  So...

6       Q.   Well, what's your basis for not

7    revealing it?

8       A.   Yeah, the very nature of me being

9    a journalist, I have sources that, again,

10   unless y'all get me under a court order --

11      Q.   You consider yourself to be a

12   journalist?

13      A.   At times.

14      Q.   Did you ever go to school for

15   journalism?

16      A.   No.

17      Q.   When you post information about

18   current events, do you do so objectively?

19      A.   It depends.

20      Q.   What do you mean, it depends?

21          Do you report on things --

22      A.   We do editorialize.

23      Q.   -- objectively?

24          Do you ever report on things with

25   a particular slant?

 1          L. Allen - Protective Order

 2          A.   We do editorialize, yes,

 3     absolutely.

 4          Q.   Okay.  And you certainly

 5     editorialized about the Tory Lanez case,

 6     right?

 7          A.   My opinion is definitely known.

 8          Q.   In fact, everything you've said

 9     about the Tory Lanez case is just your

10     opinion, right?

11          A.   Not true.  There's some things

12     that are clearly facts.  Like if we said he

13     got convicted, that's not my opinion.

14          If we said that, hey, according

15     to what the government ran tests on, that

16     Tory's DNA was found inconclusive on --

17     that's not my opinion.

18          So when you try to chalk it up as

19     everything, I'll just answer simply by

20     saying no.

21          Q.   Did you ever take any journalism

22     ethics classes?

23          A.   No.

24          Q.   Any ethics courses on journalism?

25          A.   No.

```
 1        L. Allen - Protective Order
 2        Q.   Any certifications related to
 3    ethics in journalism?
 4        A.   No.
 5        Q.   Have you ever been hired by any
 6    news outlet?
 7        A.   No.
 8        Q.   Any journalistic publication?
 9        A.   No.
10        Q.   And you're not associated with
11    any journalistic publication, right?
12        A.   No, I own my own company and we
13    operate as a independent news outlet for
14    hip-hop.
15        Q.   Have you ever said publicly that
16    you did not consider yourself to be a
17    journalist?
18        A.   Oh, definitely, as well.
19        Q.   Okay.  So when it suits you, you
20    say you don't consider yourself to be a
21    journalist, and when it does, you do
22    consider yourself to be a journalist?
23        A.   Sure.
24        Q.   Okay.  So are you or are you not
25    a journalist?
```

1            L. Allen - Protective Order

2        A.    Depending on what's being posed

3    and what time it is.

4        Q.    Okay.  So then you're not

5    somebody who engages in the profession of

6    journalism, are you?

7        A.    Well, I run a media --

8            MS. DIXON:  Objection as to form.

9        A.    I run a media company that, by

10    definition in our work in media, also

11    includes an aspect of journalism.

12            So am I a journalist?  It depends

13    on who's asking and what we're talking

14    about.

15        Q.    Okay.  Well, it doesn't.  It

16    actually depends on what you do for a

17    living and how you report on information

18    that you report on.

19            Do you understand that?

20        A.    Sure.

21            MS. DIXON:  Objection as to form.

22        Q.    So who was the source of

23    information about the DNA report?

24        A.    I don't recall.

25        Q.    Is it that you don't recall or is

1        L. Allen - Protective Order

2    it that you're refusing to answer the

3    question?

4        A.   My answer was -- you asked, I

5    answered.

6        MS. DIXON:  Objection as to form.

7        Q.   You can answer the question.

8        A.   I don't recall.

9        MS. MENILLO:  So I'm going to

10    mark this question and we're going to

11    reserve our right to take it up with

12    the judge because I think it's clear

13    from the record that it's not that the

14    witness doesn't recall, but it's that

15    the witness is refusing to answer the

16    question and understands he cannot meet

17    any criteria for any sort of privilege

18    that would allow him to avoid answering

19    the question.  ^ RQ.

20        And on a break I'll decide if

21    we're going to bring it up with the

22    judge now or at a discovery hearing.

23        MS. DIXON:  Objection as to form

24    stands.

25        MS. MENILLO:  I was just making a

```
 1          L. Allen - Protective Order

 2     to just make a record?

 3          MS. MENILLO:  Gavin, you can take

 4     this down.

 5          I do want to make a record that

 6     the conversation we had earlier, where

 7     I asked you questions about your -- the

 8     source of information, who gave you the

 9     exclusive on the DNA report, I feel

10     pretty strongly that we have a good

11     basis on which to have a Court compel

12     you to provide us with that

13     information.

14          And we will ask the Court to

15     compel that you do so, which means that

16     if a court does compel you to do so,

17     I'll have to call you back for another

18     day.  I don't really want to call you

19     back for another day for another

20     question.

21     Q.   Any chance you've changed your

22     mind and you're willing to divulge the

23     source of that information before we go?

24          MS. DIXON:  Objection as to form.

25     A.   I literally said I don't recall.
```

```
 1            L. Allen - Protective Order
 2     That's -- I mean, there is a person.
 3            Do I recall that person?  No.
 4       Q.   Okay.
 5       A.   Generally, though, I'm -- even if
 6     it was -- it could have been the judge
 7     themselves, I wouldn't tell you.
 8            So I'm sticking on that point
 9     because of the profession I'm in, but
10     genuinely with this particular situation, I
11     don't recall.
12            But if you want to -- we could
13     continue it further because, you know, this
14     is a bump in the road I'm going to have to
15     get over at some point because this is a
16     sticking point, no matter who it is.  It
17     could be my mother, it could be God from
18     heaven who told me.  I wouldn't.  So.
19       Q.   Okay.
20            MS. MENILLO:  Well, that's all
21       the questions I have unless, Ms. Dixon,
22       do you have any questions for the
23       witness?
24            MS. DIXON:  Just to be clear,
25       you're asserting a journalism privilege
```

1    L. Allen - Protective Order

2        We are now off the record.  The

3    time is 5:28 p.m. Eastern Time.

4        Thank you for your time,

5    everyone.

6        MS. MENILLO:  Thank you.

7        MS. DIXON:  Thank you.

8

9        (Time noted: 5:28 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                * CERTIFICATE OF REPORTER  *

 3      I, ANNETTE ARLEQUIN, CCR, RPR, CRR, do

 4      hereby declare:
                That prior to being examined, the
 5      witness named in the foregoing deposition
        was by me duly sworn pursuant to Section
 6      30(f)(1) of the Federal Rules of Civil
        Procedure and the deposition is a true
 7      record of the testimony given by the
        witness.
 8              That said deposition was taken down
        by me in shorthand at the time and place
 9      therein named and thereafter reduced to
        text under my direction.
10
        _____   That the witness requested to
11                review the transcript and make
                  any changes to the transcript as
12                a result of that review pursuant
                  to Section 30(e) of the Federal
13                Rules of Civil Procedure.

14      _____   Signature is waived.

15      _____   The changes made by the witness are
                  appended to the transcript.
16
        _____   No request was made that the
17                transcript be reviewed pursuant to
                  Section 30(e) of the Federal Rules
18                of Civil Procedure.

19              I further declare that I have no
        interest in the event or the action.
20              I declare under penalty of perjury
        under the laws of the United States of
21      America that the foregoing is true and
        correct.
22              Witness my hand this 29th day of

23      August 2025.

24
```



```
25      ANNETTE ARLEQUIN, NJ/NY CCR #30XI00145000
```